**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NUMBER: 1:22-CR-49** |
| | ) | |
| **ECHO A. SCHEIDT** | ) | |
| | ) | |
| **Defendant.** | ) | |

### Defendant's Sentencing Memorandum

Comes now the Defendant, Echo Scheidt, (hereinafter "Echo" or "Ms. Scheidt"), by counsel, and submits this Sentencing Memorandum.

### Sentence

Ms. Scheidt agrees with the Presentence Investigation Report, (hereinafter "PSIR"), which states that her total offense level is 13. (PSIR ¶ 48). She also agrees that her criminal history score is computed as zero (0) and establishes a criminal history category of I. (PSIR ¶ 53). This results in a guideline range of imprisonment of 12 to 18 months. (PSIR ¶ 84). There is no plea agreement in this case. Ms. Scheidt pled guilty to all counts without the benefit of any binding or non-binding recommendations from the government.

### 18 U.S.C. § 3553(a)(1) – the nature and circumstances of the offense and the history and characteristics of the defendant:

Echo said that she lived in a good neighborhood that was in a small community and "everyone knew everyone." She felt safe in the neighborhood. In that safe neighborhood where she lived with her mother, she was not safe in her own home because she was molested by her mother's then-boyfriend. She was concerned that her mother would not believe her if she disclosed the abuse, so she did not tell her mother about it which made the abuse "continue for

1

some time." When she eventually told her mother about the abuse, having been encouraged to tell by a concerned neighbor who intervened on her behalf, her mother neglected to do anything to help Echo deal with being a victim of sexual abuse. She was not taken to therapy, nor did she receive any other kind of treatment.  Her mother's relationship ended with that boyfriend but the next man that she brought around her daughter created an abusive relationship for the mother and Echo witnessed much of that abuse.  The police were often at her childhood home because of the conflicts between her mother and this new boyfriend. Echo described her living situation, while still in elementary school, as "chaotic." (PSIR ¶ 60). Echo finally found peace love and support when she moved in with her grandparents. (PSIR ¶ 61).

Echo never knew her father and felt envious of other kids who had good, heathy relationships with their fathers. These feelings caused resentment and animosity toward her mother. (PSIR ¶ 60).

As an adult, Echo fell into the cycle of domestic violence with her then- partner. She was physically and mentally abused but stayed in the relationship much longer than she should have because she did not want her own children to grow up without a father figure, as she did. (PSIR ¶ 63).

Echo is now working on her relationship with her mother. She indicates that the two have bonded over her granddaughter. Echo is also working on her relationship with her daughter, Alexus. Alexus is now living with Echo and the two of them work together at McDonalds. They see the baby (who the great-grandmother has guardianship over) together and that experience brings them closer.

Echo is submitting with this memo a video with statements from her mother, Lucinda Linder, and her boyfriend, Marquel Young. The people who know her best describe the changes they have seen in Echo while this case has been pending. Echo is trying to break the vicious

cycle that she and her mother, as well as her 20-year-old daughter, have experienced regarding toxic and abusive relationships, (Alexus was living with the father of the baby and the police were frequently called to the home because of their arguments and behavior. Ms. Linder finally stepped in and filed a petition to establish guardianship over the baby. The judge in the case gave the parents an opportunity to try to prove that they could appropriately support the baby, but their behavior did not change or improve so the judge granted guardianship to Ms. Linder.) Alexus has now left the home with the child's father and is living with Echo. The two of them are working together and are bonding while taking care of the baby. Alexus has shown dramatic improvement in her behavior and attitude and Ms. Linder is allowing Alexus to have unsupervised visits while she is at Echo's home.

Marquel describes the changes in Echo the best. Echo is going to work and supporting herself and making good decisions. Her behavior and attitude have had a positive impact on her relationship with her mother. Alexus has also watched the changes in her mother over the past year and is now following her mother in making positive changes. As Marquel said in the video, these positive changes that are impacting this family will flow to the 8-month-old baby, who is in a better position than anyone before her to have a good, healthy and safe childhood.

As detailed in Paragraph 67 of the PSIR, Echo has a host of chronic medical issues. She is on medications that are taken to relieve pain from fibromyalgia, arthritis, degenerative disk disease and painful bone spurs. She will require continued use of medications to manage the pain and symptoms associated with her many ailments. (PSIR ¶ 67). As the PSIR notes, the annual cost of incarceration at the BOP is $44,258.00, per inmate. (PSIR ¶ 100). Those costs are reduced by $8500 if the inmate is sentenced to a Community Corrections Center. However, a Department of Justice Report from 2019 highlighted some of the specific challenges of dealing

with inmates who are chronically ill and the resulting rising costs:

https://www.justice.gov/jmd/page/file/1034421/download

>*-Providing medical care to inmates continues to be a major portion of the BOP's overall spending (p. 10).*
>*-recruitment of medical professionals was one of the BOP's greatest challenges and that staffing shortages (a) limit inmate access to medical care, (b) result in an increased need to send inmates outside the institution for medical care, (c) contribute to increases in medical costs, and (d) can affect prison safety and security. (p. 10).*
>*-Even contracting medical services in remote communities is challenging, and can result in higher costs due to the need for transporting inmates with serious medical and mental health problems a further distance from the parent institution. (p. 11).*

**Nature and Circumstances of the Offense**

The instant offense conduct involves multiple firearms. Several were sold to a friend, Juan Cruz, and through Mr. Cruz, one of those firearms was found in the possession of a person accused of shooting and killing a police officer. The firearm purchased by Echo was not the firearm used to kill the police officer. Echo told ATF agents that Cruz was a cartel member but there is no other evidence to suggest the veracity of that statement. In fact, Echo now acknowledges that the statement to ATF was a sensational rumor that she heard and told the agents. Mr. Cruz has no criminal history. Echo said she was "familiar" with Carl Boards (the person charged with the murder of the police officer) because her son went to his barber shop, but she did not sell any firearms to him. She certainly was not familiar enough with him to sell him firearms or to suspect or foresee that he would eventually gun down a police officer with an AK style rifle after a routine traffic stop. (PSIR ¶ 7).

Echo very quickly accepted responsibility for her actions. She acknowledged falsely filling out and signing the 4473 forms for the weapons she purchased when she first spoke with ATF. The next day she called to self-report that she was not honest about what she did with the firearms and then provided additional information to the agents. (PSIR ¶¶ 13-17).

4

**Criminal History and Adjustment to Supervision**

Echo has no criminal history. She has been on Pretrial Release in the instant offense for almost a full year. She has demonstrated an ability to abide by terms and conditions of release, remaining in compliance with those terms. (PSIR ¶¶ 3-5). Since admitting her continued use of marijuana, she has not had a single positive drug screen. She has maintained stable employment and stable housing. She has not had a violation while on pretrial release. She has struggled to make and keep her appointments at Bowen Center. Her explanation is that she had been working a third shift job and was finding it difficult to get into a good routine with her sleeping. She said that some days she would get home from work and fall right to sleep. Other days she would take a shower, which would give her some energy, so she would stay awake but then fall asleep later in the day and she missed appointments because of that. She is now working at McDonalds (she started the new job about 2 weeks ago) closer to home and is able to better manage her schedule so that she can attend her counseling sessions. She attended her session on August 1st.

Paragraph 107 of the PSIR identifies aggravating factors the Court may wish to consider when imposing a sentence. The death of the police officer is certainly a "grave concern" but the person responsible for that death is charged with the murder and is facing a potential death sentence because of his actions. The AK style rifle used in the murder is not associated in any way with Echo. The probation officer ends the paragraph with the statement that Echo choosing to sell firearms to Mr. Cruz was "extremely careless." Echo was careless for selling firearms to anyone, particularly to someone who was supposedly connected to a drug cartel. It is not a crime to be careless. Echo's crimes are reflected in the counts filed in her indictment and she has admitted and pled guilty to each of those counts.

If a term of imprisonment is the appropriate punishment, Ms. Scheidt respectively requests the opportunity to voluntarily surrender to the Bureau of Prison's designated facility. It

5

is the undersigned counsel's understanding that if allowed to self-surrender, Echo will be able to enter the facility with a 30-day supply of her medications. Self-surrender will also allow Echo some additional time to work and prepare her family for her absence.

### Conclusion

An analysis of Section 3553(a) factors in this case reflects a need for a sentence equal to the minimum sentence of her guideline range. Because her guidelines fall into Zone C of the Sentencing Table, the minimum term may be satisfied by (1) a sentence of imprisonment; or (2) a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention according to the schedule in subsection (e), provided that at least one-half of the minimum term is satisfied by imprisonment. USSG §5C1.1(d). Ms. Scheidt respectfully requests the Court consider her quick and complete acceptance of responsibility, her character, her conduct while on pretrial release, her stable employment and her mental/physical health and find each provides sufficient mitigation to warrant a low-end sentence.

Respectfully submitted,

Northern District of Indiana
Federal Community Defenders, Inc.

By:    s/ Michelle F. Kraus
       Michelle F. Kraus
       200 East Main Street
       Ft. Wayne, Indiana 46802
       Phone: (260) 422-9940
       Email: Michelle_Kraus@fd.org

### CERTIFICATE OF SERVICE

I hereby certify that, on August 2, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notifications of such filing to all parties of record.

       s/ Michelle Kraus